# EXHIBIT "6"

## AMERICAN BANKER

## Bank of America Sold Card Debt...

## March 29, 2012

# AMERICAN BANKER.

# Bank of America Sold Card Debts to Collectors Despite Faulty Records

**By** Jeff Horwitz
MAR 29, 2012 6:31pm ET

**Bank of America has sold collections agencies rights to sue over credit card debts that it has privately noted were potentially inaccurate or already repaid.**

In a series of 2009 and 2010 transactions, Bank of America sold credit card receivables to an outfit called CACH LLC, based in Denver. Co. Each month CACH bought debts with a face value of as much as $65 million for 1.8 cents on the dollar. At least a portion of the debts were legacy accounts acquired from MBNA, which Bank of America purchased in 2006.

The pricing reflected the accounts' questionable quality, but what is notable is that the bank could get anything at all for them. B of A was not making "any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever" about the accuracy or completeness of the debts' records, according to a 2010 credit card sales agreement submitted to a California state court in a civil suit involving debt that B of A had sold to CACH.

In the "as is" documents Bank of America has drawn up for such sales, it warned that it would initially provide no records to support the amounts it said are owed and might be unable to produce them. It also stated that some of the claims it sold might already have been extinguished in bankruptcy court. B of A has additionally cautioned that it might be selling loans whose balances are "approximate" or that consumers have already paid back in full. Maryland resident Karen Stevens was the victim of one such sale, which resulted in a three-year legal battle (see related story).

Bank of America declined requests to comment for this story, other than to say through spokeswoman Betty Riess that it works with credit card customers to try to resolve delinquent debt issues. CACH did not respond to several phone and email messages seeking comment on the terms of its purchases.

Some industry observers said that the language in Bank of America's sales documents should be regarded as standard legalese intended to protect it against a disgruntled buyer's legal claims. And even though Bank of America refused to stand behind the accuracy of the records it sold, debt buyers are the ones who make the call to sue.

"The buyer has the primary responsibility to test the ... quality of what they're buying," says Samuel Golden, a former OCC ombudsman who is a managing director at consulting firm Alvarez & Marsal in Houston, Texas.

Collectors' responsibilities aside, other banks' sales agreements suggest Bank of America's standards are emblematic of wider industry practice that raises risk management concerns. For less than $1.2 million a month — a rounding error on B of A's income statement — the company sold CACH accounts that raise regulatory and reputational questions about the accuracy of its records and its disclosures to courts.

## Industry Practice

As the originators of credit card loans, banks are at the headwaters of the rivers of bad debt that flow into the collections industry. Over the last two years, Bank of America has charged off $20 billion in delinquent card debt. The bank settles or collects a portion of that itself and retires other accounts when borrowers go bankrupt or die. An undisclosed portion of the delinquent debt gets passed along to collectors. Once sold, rights to such accounts are often resold within the industry multiple times over several years.

Bank of America's caution that its card records may be incomplete or inaccurate suggests that documentation and accuracy problems may originate at the debt's source. Other banks' debt sale contracts acknowledge potentially large holes in their records as well.

One such example involves a 2009 U.S. Bancorp forward flow agreement, which outlines plans to sell a certain volume of delinquent accounts in the future. U.S. Bancorp's agreement states that it may have failed to credit borrowers for some payments and only guarantees the accuracy of account balances within a 10% margin of error.

Teri Charest, a spokeswoman for the bank, noted that the contract had expired and said that, regardless of such past contractual language, the bank scrubs its card data and that the claims it sells are accurate.

JPMorgan Chase, meanwhile, drafted an agreement to sell $200 million of credit card debt to Palisades Collection in 2008, even though records proving the debt might be unavailable for close to half the claims. "Seller represents and warrants that documentation is available for no less than 50% of the Charged-off Accounts," JPMorgan Chase's sales agreement stated.

The bank declined to comment. Palisades' chief counsel Seth Berman says the company has not bought Chase card debt in several years, but that its standards were always high.

The U.S. Office of the Comptroller of the Currency is already investigating JPMorgan Chase's handling of credit card debt records, as reported by *American Banker* earlier this month. A group of current and former employees described at the time how the bank had sold card accounts previously deemed "toxic waste" and which suffered from errors in the amounts being claimed.

## CACHing In

At Bank of America, records declared unreliable yet sold to CACH were used to file thousands of lawsuits against consumers, according to a review of hundreds of cases in the state courts where collection suits are typically filed. The overwhelming majority of cases end in default judgments, which are awarded to creditors when borrowers don't show up to contest the claims made against them.

americanbanker.com/issues/177_62/bofa-credit-cards-collections-debts-faulty-records-1047992-1.ht...

2/5

In cases where debtors do challenge collections demands in court, the original bank-creditor must testify about the documentation supporting the claims. In several such instances, people identified as Bank of America employees have submitted affidavits attesting to the validity of debts sold by the bank to collections firms.

Even though Bank of America previously disavowed "the accuracy of the sums shown as the current balance," the sworn statements vouch for the borrowers' debts down to the penny and declare that the bank's "computerized and hard copy records" back the claims. There are other possible discrepancies, as well: the affidavits state that B of A "has no further interest in this account for any purpose," while the sales contracts reference a "revenue sharing plan."

The prospect that B of A was selling unreliable credit card debts did not deter CACH from buying them. A subsidiary of SquareTwo Financial, CACH does not collect debts itself. Instead, it operates like a restaurant franchiser, acquiring rights to the delinquent debts that are the raw materials of the collections business. It then works with law firms around the country that do the actual collections work, providing them with debt files, court witnesses and other services.

In thousands of cases in state courts, CACH has appended a single page from its purchase agreements with Bank of America attesting to its ownership of delinquent credit card debt. CACH has omitted from many such filings the more than 30 additional pages where Bank of America disclaims the accuracy of its debt records. Even so, attorneys affiliated with CACH have cited the reliability of Bank of America's records as the foundation for their collections lawsuits.

In the case involving CACH in Duval County, Florida, a person described as B of A "Bank Officer" Michelle Samse swore in an affidavit that "There is due and payable from WENDY CODY as of 9/18/2009 the sum of $12266.83." The Samse affidavit, typical of many others, went on to say "The statements made in this affidavit are based on the computerized and hard copy books and records of Bank of America, which are maintained in the ordinary course of business." Attempts to contact Samse and Cody through Bank of America switchboards and public records searches were unsuccessful.

**Trust Us**

The degree of precision attested to regarding Cody's debt is curious, considering that Bank of America declared it was unable to produce records to back it up. "[T]he original contract in this matter has been destroyed, or is no longer accessible," Samse's affidavit states. "This affidavit is to be treated as the original document for all purposes."

The affiliate representing CACH in the Cody case was Collect $outheast, which uses the phrase "Let us show you the MONEY!" in company promotions. Collect $outheast and Florida attorneys representing CACH in other cases did not respond to requests for comment.

Taras Rudnitsky, a consumer defense attorney in Lake Mary, Florida has regularly defended consumers against lawsuits filed by CACH affiliates in Duval County. He says he regularly demands that debt buyers file banks' sales agreements with the court and invariably runs into stiff opposition.

"In every single case I have involving a debt buyer, they refuse to produce a forward flow agreement," he says, referring to the term for sales contracts under which banks agree to sell a specific number

rd to Sell to Collectors Despite Faulty Records - American Banker Article

of delinquent accounts in the future. "When push comes to shove, the case disappears."

## Weak Link

For individual clients, dismissal of such a case is a victory, but such outcomes are the exception. In the vast majority of collections suits, consumers fail to respond to card payment demands and become liable for default judgments, says Peter Holland, who runs the University of Maryland Law School's Consumer Defense clinic and has collected some of the forward flow agreements. As a result, the questionable reliability of second-hand debt claims is failing to receive the attention it deserves, he says.

"The [terms of] forward flows are being hidden from the public and from the courts," says Holland. "When the banks say explicitly that they don't have the documentation, that's something courts need to know. When a bank says a balance is 'approximate,' that's something courts and consumers need to know."

To date, it is debt collectors who have been the main focus of complaints and lawsuits alleging wrongdoing. In the past year alone, collections firms have paid out a number of multi-million dollar settlements over allegations they robo-signed affidavits, failed to produce evidence to support payment demands and sued consumers over debts that were no longer owed.

According to a trade organization for the collections industry, much of the criticism of collectors' records stems from banks' failure to provide adequate documentation of debts.

"We're not getting what we need from the seller," says Mark Schiffman, a spokesman for the American Collections Association, which wants to see better recordkeeping and more documentation included in debt sales. "Consumer groups want to see original contracts and original documentation. That would make a lot of these debts disappear because a lot of that documentation may not exist."

## Regulatory Interest

Washington regulators are beginning to look at what responsibility banks have for wrongful collections activity. But questions about jurisdiction and whether banks will get roped in remain open.

"Not enough information [is] flowing through to debt collectors," says Tom Pahl, an assistant director in the Federal Trade Commission's division of financial practices. Despite its concern, the FTC lacks the authority to regulate financial institutions

"We can't reach the banks to say 'Thou shalt file the following pieces of information with the loans,'" Pahl says. "We're trying to do most of this through either law enforcement, which is case-by-case, or by jawboning the industry."

The Consumer Financial Protection Bureau has jurisdiction over credit cards and last month announced plans to take a close look at the collections industry. The bureau's interest has been heightened by revelations of abuses by mortgage servicers, including robosigning of affidavits, according to spokeswomen Jennifer Howard.

The CFPB is "very concerned that the same shortcuts and violations may be occurring with other

kinds of debt collection," she says.

The OCC, which likewise oversees banks, declined to comment on specific institutions' sales of credit card receivables. However, it expects banks to adhere to high standards regarding account records, especially in cases where institutions attest under oath to their accuracy, according to OCC spokesman Bryan Hubbard.

"There may be reasons it's hard to do. Large portfolios being bought. Systems integration. But banks are still accountable for maintaining accurate records," says Hubbard.

---



© 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT "7"



**STATE OF WEST VIRGINIA**
**OFFICE OF THE ATTORNEY GENERAL**
**DARRELL V. MCGRAW, JR.**
**CONSUMER PROTECTION DIVISION**
**1-800-368-8808 or 304-558-8986**

# Press Release

October 27, 2006

*FOR IMMEDIATE RELEASE*
CONTACT: JILL L. MILES
304-558-8986
1-800-368-8808

### ATTORNEY GENERAL DARRELL McGRAW ANNOUNCES SETTLEMENT WITH PINNACLE CREDIT SERVICES, A MINNESOTA DEBT PURCHASER

Attorney General Darrell McGraw announced a settlement with Pinnacle Credit Services, a Minnesota limited liability company that purchases consumers' debts from creditors and then attempts to collect these debts from the consumers.

Attorney General McGraw's Consumer Protection Division began investigating Pinnacle after receiving a complaint from a consumer who stated that she did not owe the debt Pinnacle was attempting to collect. The consumer had previously disputed this debt with another debt collector and provided proof that the debt was not hers. During the investigation, the Division discovered that Pinnacle was not licensed to collect debts in West Virginia.

Under the settlement agreement, Pinnacle agreed to cease collections in West Virginia until it is properly licensed. Pinnacle also agreed that all West Virginia accounts that it owns will be deleted from its records and that it will notify the three major credit reporting agencies to delete all references to these accounts from the consumers' credit reports. Pinnacle estimates that the cancelled debt will total over $1 million.

Consumers may receive collection notices for debts in amounts they believe to be inaccurate or for creditors they do not recognize. Attorney General McGraw advises these consumers that they should dispute the debt in writing and request documents that verify the debt. Old debts are regularly shuffled from the original creditor to multiple collection agencies or sold to debt purchasers. Information regarding these debts is transmitted electronically and may be inaccurate. Moreover, the collection agency or debt purchaser may have added unlawful additional fees to the original debt.

Consumers who are interested in more information on how to dispute a debt may visit the Attorney General's website at www.wvag www.wvago.us or contact his Consumer Protection Division at 304-558-8986 or 1-800-368-8808.

###

# EXHIBIT "8"



Experian™

A world of insight

## Record of requests for your credit history

We make your credit history available to your current and prospective creditors and employers as allowed by law. Experian may list these inquiries for up to two years so that you will have a record of the companies that accessed your credit information.

## Inquiries shared with others

The section below lists all of the companies that have reviewed your credit report as a result of an action you took, such as applying for credit or financing or as a result of a collection. The inquiries in this section are shared with companies that view your credit history.

**Prepared for**
DEON L THOMAS

**Report number**

**Report date**
December 03, 2010
www.experian.com/disputes
P.O. Box 2002, Allen, TX 75013

**Page 16**

## Inquiries shared only with you

You may not have initiated the following inquiries, so you may not recognize each source. We report these requests to you only as a record of activities, and we do not include any of these requests on credit reports to others.

We offer credit information about you to those with a permissible purpose, for example to:

- other creditors who want to offer you preapproved credit;
- an employer who wishes to extend an offer of employment;
- a potential investor in assessing the risk of a current obligation;
- Experian Consumer Assistance to process a report for you;
- your current creditors to monitor your accounts (date listed may reflect only the most recent request);
- a static copy of your credit report provided to a subsequent user necessary to complete your mortgage loan application.

## These inquiries do not affect your credit score.

**NELSON WATSON & ASSOCIAT**
80 MERRIMACK ST LOWR LEVEL
HAVERHILL MA 01830
No phone number available

*Date*
Feb 7, 2009

000

# EXHIBIT "3"

## AMERICAN BANKER

## JPMorgan Chase Quietly Halt Suits Over Consumer Debt...

## January 10, 2012

# AMERICAN BANKER.

# JPM Chase Quietly Halts Suits Over Consumer Debts

**By** Jeff Horwitz
JAN 10, 2012 5:55pm ET

**JPMorgan Chase & Co. has quietly ceased filing lawsuits to collect consumer debts around the nation, dismissing in-house attorneys and virtually shutting down a collections machine that as recently as nine months ago was racking up hundreds of millions of dollars in monthly judgments.**

A sampling of court records in the major cities in five states shows that Chase collection suits have virtually disappeared. In a sixth state, Illinois, contract attorneys continue to file small-dollar cases, though at a reduced rate.

It is unclear whether Chase has stopped pursuing collection on many claims nationwide, or if intends to pursue the debts in some other fashion. The bank has not explained its apparent moratorium and declined comment.

Chase's halt does, however, follow scattered defeats in state courts and a whistle-blower's allegation that it falsely overstated the balances of thousands of delinquent accounts it sold to a third party. Former Chase employees and debt collection experts insist that the bank would not have abruptly retreated from its collections efforts in the absence of trouble.

In a sign that Chase acted with urgency, numerous regional collections teams were fired in mid-2011 at the order of the New York bank's headquarters, according to people familiar with the events.

"Nobody told anybody anything. It was very traumatic," says a former Chase attorney who asked to remain anonymous because of a nondisclosure agreement. "I think there were investigations by the [Office of the Comptroller of the Currency] and other government entities. If we're not there, we can't be interviewed."

The OCC declined to comment. Chase declined to say whether its moves were related to government investigations or legal concerns. In an email to *American Banker*, a spokesman for the bank called its collection strategy "proprietary."

Chase and other credit card issuers have historically filed lawsuits to compel consumers to repay defaulted loans. Such suits typically involve only a few thousand dollars each, but en masse add up; Chase recovered $1.4 billion from defaulted credit card accounts last year, according to its financial filings with the Securities and Exchange Commission. (Not all of that necessarily came from

Jerry Salzberg, a lawyer who represents debt collectors and banks in the Chicago area, was familiar with Chase's dismissed Illinois collections attorneys, whom he describes as experienced, productive and profitable.

"Someone from New York brought in the three lawyers, kicked them out with no warning and dismissed all their cases," Salzberg says. "These were people who were by the book. ... If they weren't the most profitable [of Chase's regional collection teams], they sure as hell were making a lot of money for the bank. ... Obviously something happened."

Chase collections cases have dropped off sharply in Illinois in recent months, in addition to disappearing in five other states, an American Banker review indicates. The review focused on California, Florida Maryland, New York and Washington, where local court records are electronically searchable.

In Dade County, Florida, which includes Miami, Chase filed 640 collections claims in January 2011, most seeking between $3,000 and $12,000. On Jan. 4 alone it filed suits seeking over $200,000, which represents a rate of $50 million annually.

But in April of last year, Chase ceased filing claims altogether in Dade County. That month, *The Wall Street Journal* first reported that Chase had dropped "more than a thousand" consumer debt cases around the country. Some contract attorneys cited documentation irregularities for the move, the paper reported.

Robo-signing, or the high-volume production of signed legal documents, has been a key element of the governmental and media foreclosure reviews. Chase's current pullback raises at least the possibility that at least some banks may have documentation problems in other business lines.

Academics and attorneys who defend consumers against debt claims have leveled their heaviest criticism at collection agencies rather than banks themselves. The agencies allegedly seek on a regular basis to collect debts in the absence of legitimate documentation. Efforts to collect a bank's own debt generally have been regarded by consumer advocates as more credible than those by collections agencies, which pursue secondhand claims.

"If sloppy record keeping and problems with false affidavits is a problem with mortgages, it's 100 times bigger in credit card accounts," says Michelle Weinberg of the Legal Assistance Foundation of Metropolitan Chicago. Even so, Weinberg says, "On documentation issues, it wouldn't occur to me that Chase wouldn't be able to prove up its own account."

So far judges have questioned the validity of banks' own consumer debt records in only a few low-profile cases. However, a whistle-blower claim settled last year raises further questions.

Linda Almonte, a former team leader in Chase's San Antonio credit card services division, accused the bank of firing her for objecting to the sale of $200 million in legal judgments obtained by bank attorneys. Half the accounts lacked adequate documentation of judgment and one-sixth listed the wrong amounts owed, Almonte claimed in a suit filed in U.S. District Court for the Western District of Texas.

www.americanbanker.com/issues/177_7/jpmorgan-chase-consumer-debt-collection-1045606-1.html?...

2/3

In its response, Chase did not dispute inaccuracies in the debt balances and documentation. Instead, it said its sales agreement allowed for errors and thus was proper. "[T]he parties explicitly agreed that the judgments were purchased 'as is' and "with all faults," Chase's attorney wrote.

Chase was unsuccessful in getting the case dismissed and settled it on undisclosed terms last April; it ceased filing new consumer debt lawsuits in many states the same month.

Should Chase stop pursuing such claims for any reason, the move could prove costly. The threat of litigation has an unquantifiable but significant influence on consumers' decisions to pay off their debts. What's more, even partial recoveries can be substantial and may already be declining as the result of Chase's pullback. After recouping $405 million in the first quarter of 2011, Chase's recoveries fell to $321 million in the second quarter and $266 million in the third quarter.

It is hard to say whether the absence of new suits has contributed to the decline. Credit card recoveries tend to be volatile and lag writeoffs. In the absence of its own collections activities, Chase could also be recouping money selling delinquent loans to collections agencies who then seek recoveries on their own. But a search for defendants in 10 cases that Chase dropped this spring did not uncover any surrogate claims.

*Next: A review of legal challenges in the consumer debt buying industry — and how banks can protect themselves from reputational and legal risks.*

---

 **SOURCEMEDIA™**

© 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT "4"

## AMERICAN BANKER

## OCC Probing JPMorgan Chase Credit Card Collection...

## March 12, 2012

# AMERICAN BANKER.

# OCC Probing JPMorgan Chase Credit Card Collections

**By** Jeff Horwitz
MAR 12, 2012 9:24pm ET

*First in a series*

JPMorgan Chase & Co. took procedural shortcuts and used faulty account records in suing tens of thousands of delinquent credit card borrowers for at least two years, current and former employees say.

The process flaws sparked a regulatory probe by the Office of the Comptroller of the Currency and forced the bank to stop suing delinquent borrowers altogether last year.

The bank's errors could call into question the legitimacy of billions of dollars in outstanding claims against debtors and of legal judgments Chase has already won, current and former Chase employees say.

For the banking industry at large, the situation at Chase highlights the risk that shoddy back-office procedures and flawed legal work extends well beyond mortgage servicing.

"We did not verify a single one" of the affidavits attesting to the amounts Chase was seeking to collect, says Howard Hardin, who oversaw a team handling tens of thousands of Chase debt files in San Antonio. "We were told [by superiors] 'We're in a hurry. Go ahead and sign them.'"

Hardin left the bank in 2010 to work in a different industry.

Chase declined repeated requests to discuss details of its consumer debt collection activities.

Company documents, court filings, and interviews with seven current and former employees reveal that Chase's credit card litigation operation was allegedly plagued by unreliable external attorneys, management's disregard for accuracy, and patchy technology.

The bank's computer systems frequently disagreed about how much debtors actually owed, several of the Chase sources say.

The employees' stories corroborate allegations made by Linda Almonte, a former mid-level business process executive in Chase's San Antonio-based Credit Card Litigation Support Group. Dismissed in November 2009 after six months on the job, Almonte filed whistleblower complaints and a wrongful termination suit claiming that she was fired for objecting to the sale of credit card debts with

erroneous balances.

Almonte's complaints drew the attention of the OCC, former Chase employees say, and led to the April 2011 shutdown of a formidable collections operation that generated several billion dollars of legal judgments every year.

Few details of the OCC's investigation are available, but current and former Chase employees confirm that staffers from the agency's enforcement division spent two months gathering information in the San Antonio facility late last year. A person familiar with the OCC's review says that the regulator is taking the situation very seriously.

This is the first article in a series that will look at what allegedly went wrong in Chase's credit card litigation operation — and how those missteps could roil the banking and debt collection industries.

## 'Outhouse' Attorneys

The root of Chase's card collections failures was more machine than man. Chase maintains a patchwork of computer systems that don't always communicate well, according to former employees who used them. Meet TSYS, TCSF and RMS.

TSYS is what outsiders assume a global bank's customer data system looks like. Licensed from Total Systems Services Inc. and managed by Chase, it's the modern and versatile system that consumers ultimately talk to when they check their credit card balance online.

TSYS only handles current accounts, however. When customers stop paying credit card bills, their accounts are passed to TCSF, for collections and litigation, and eventually to RMS for charge-offs.

Each of Chase's systems handles its own tasks just fine. The problem employees faced is that TCSF and RMS can only talk to each other through TSYS, and each of the systems operates by its own rules. This means that when presented with the question of how much a customer owes, each might spit out a different answer.

"I came across that on a regular basis," says Carole McGinn, who retired in 2010 from the credit card litigation support group in San Antonio. The discrepancies were usually minor, she and three other employees say, but payments by heavily delinquent borrowers would throw the records seriously out of whack.

"There was no way to reconcile those balances that I knew of," says McGinn, who worked at Chase for almost 15 years.

To overcome this problem, Chase's business process staff reviewed records in multiple systems and reconciled the accounts manually.

Chase's relationship with outside debt collectors posed another potential glitch. In populous states like California, Illinois and Florida, the bank employed in-house attorneys who were wired into all of its relevant computer systems.

Elsewhere, it relied on what credit card litigation staffers referred to as "outhouse attorneys." Paid according to how much money they recovered, the outsiders were connected only to TCSF, the

litigation system. Former Chase employees say some of the firms, such as the since-imploded Mann Bracken LLP, were known for poor recordkeeping.

Chase's San Antonio crew was well versed in dealing with their computer systems' quirks and the outside firms' foibles. They adjusted accordingly, monitoring outside law firms for errors and stripping inaccurate charges from accounts.

"We made it work," says a former employee.

### "Everything in Dollars Collected"

Things began to change in 2008, when Chase replaced the credit card division's San Antonio management, current and former Chase employees say. The bank installed Edmond Helaire as the San Antonio operations director, and he hired Jason Lazinbat as his No. 2.

Chase staffers who spoke with *American Banker* say they were never told the reason for the house-cleaning, but several speculate that the bank was looking to increase recoveries. Even before the financial crisis made a shambles of consumers' finances, Chase's expanding credit card portfolio and growing propensity to sue for unpaid debts had dramatically increased the volume of cases it handled.

At the beginning of the last decade, Chase recouped $130 million a year from bad consumer debt of all stripes. By 2009, recoveries on credit cards alone exceeded $1.2 billion. Over the next two years, the bank would charge off more than $20 billion in credit card accounts. Litigation was the most profitable way to handle the bad debts.

Lazinbat was a Chase veteran with experience overseeing teams of debt collectors. He chafed at what he saw as the duplicative checks and balances that the old guard considered essential to ensuring the numbers were accurate, former employees say.

Lazinbat "measured everything in terms of number of dollars collected," says a former Chase employee who requested anonymity. "He did not understand that in the process world, that's not what you look at. That's not the metric."

Chase spokesman Paul Hartwick responded to messages left for Lazinbat, who declined to comment.

Rank-and-file staff began complaining about orders to take shortcuts as part of the broader culture clash, current and former employees say. The conflict ended when Lazinbat and Helaire terminated several key mid-level officials in 2008 and early 2009, employees say.

### "Documents Were Trashed"

One of the replacements brought in was Linda Almonte, a congenitally upbeat former Washington Mutual process execution manager who gets excited about Six Sigma quality control.

By the time of Almonte's May 2009 arrival, the rapidly expanding portfolio of delinquent accounts and the quirks in Chase's systems had produced serious problems, she and others say.

The outside attorneys were one flashpoint. The records the law firms used to sue people sometimes differed from Chase's own files at an alarming rate, according to a routine Chase presentation prepared by Almonte and later submitted to the Securities and Exchange Commission. Some law firms' records disagreed with Chase's in almost 20% of cases sampled, a rate far above what is regarded as an acceptable level of errors.

"That's horrendous," says a former Chase attorney who was informed of the numbers by *American Banker*.

The outsiders' lack of access to TSYS was one weakness. Another was that the law firms' recovery-based pay encouraged slapdash work, says the former attorney and other former Chase employees.

"They did not make a meaningful review of what they had," the attorney says.

The staff of the Credit Card Litigation Support Group grappled with quality control and how to ascertain that customers did, in fact, owe the company money. In one Chase email, Almonte suggested to Lazinbat that the bank should negotiate with delinquent customers before suing them. Doing so, she wrote, would "weed out additional accounts that were settled or payments made that are not showing up in the system."

Other things were falling through the cracks. Borrower correspondence sent to the San Antonio facility, such as bankruptcy notifications, address changes, and hardship requests were being dropped on an unmanned desk, according to a 2009 printout from Chase's troubleshooting log.

"There is no existing … process in place that states what action should take place when … this correspondence is received," notes a log entry submitted by an employee.

(The emails and internal records cited in this story are pulled from Almonte's whistleblower complaints. While Chase has declined to discuss them, former employees attested to the documentation's apparent legitimacy.)

Documents weren't simply misplaced: Chase shredded incoming correspondence such as records of borrower payments and counter-judgments extinguishing debts, Almonte alleged in her wrongful termination suit.

While none of the people who spoke with *American Banker* witnessed this, McGinn says she also heard colleagues acknowledge that some correspondence had been destroyed.

"I understand there were documents trashed, yes," she says. McGinn retired from the San Antonio facility in June of 2010 after she says she became uneasy with how it was being managed.

"My mouth was going to get me in more trouble than I could live with," McGinn says.

## Three Signers, Billions in Debt

Former Chase employees say they used to consider the mass production of affidavits by document signers to be at most a technical concern. This is because quality control staff traditionally vetted the files thoroughly for bankruptcies, identity theft, and errors before passing the documents to signers.

But given their growing concerns about possible errors in underlying collections and litigation records, these procedural issues began to seem substantive.

One of Chase's most prolific affidavit signers was Ruben Alcaraz, one of three San Antonio liaisons with the in-house collections attorneys, court filings indicate. By law, collection affidavits require the signer to be familiar with the bank's pertinent records.

(The failure to follow similar procedures in the mortgage market is what created the industry's foreclosure robosigning problems.)

"Based upon my review of the Plaintiff's books and records of Defendant's account(s), I have personal knowledge of the facts set forth in the attached pleading," states one Pennsylvania card-debt affidavit signed by Alcaraz. "This verification is made subject to the penalties of [Pennsylvania law] relating to unsworn falsification to authorities."

Numerous former employees say that Alcaraz and his colleagues rarely if ever reviewed such files. They routinely signed stacks of affidavits on flights and in meetings, which in some cases were attended by Helaire, Lazinbat and Chase compliance staffers. Nobody objected, Almonte and others say.

Alcaraz also describes himself in the court documents as an "officer of the bank" and an "Assistant Treasurer." High-level Chase management had instructed the staff to stop signing documents using such titles around the middle of the last decade, four Chase sources say. But Lazinbat ordered them to do it anyway. An operator for Chase's internal switchboard identified Alcaraz as a "business analyst."

"Hardly, if ever, was anything verified," Almonte's SEC complaint states. "There was constant complaining by the Attorney Liaisons about having to manually sign these affidavits … they always questioned why they could not have them digitally signed in bulk."

"Each and every one of those [affidavits] should have been manually checked," says Hardin, framing the issue as one of basic quality control. "There was a lot of need for diligence, and sometimes that just didn't happen."

A message left for Alcaraz was returned by Chase spokesman Hartwick, who said that Alcaraz declined to comment.

## "A Huge Cleanup"

Almonte says she initially limited her criticism of Chase's operations to pushing internally for improvements.

"I have a lot of areas where the ball was dropped … and now we have a huge cleanup," she wrote in an email to Lazinbat in October 2009.

While Almonte says her relationship with Helaire and Lazinbat was initially excellent, it fell apart when she began questioning how the bank was handling the sale of $200 million of legal judgments to an outside debt collection company.

Nearly half of the files her team sampled were missing proofs of judgment or other essential information, she wrote to colleagues. Even more worrisome, she alleged in her wrongful-termination suit, nearly a quarter of the files misstated how much the borrower owed.

In the "vast majority" of those instances, the actual debt was "lower that what Chase was representing," her suit stated.

Among the files Chase was selling, Almonte said, were former Providian Financial Corp debts that had previously belonged to the failed Washington Mutual. (JPMorgan acquired Wamu's assets from the Federal Deposit Insurance Corp. in 2008.) The Providian files had been labeled with a code that that the credit card litigation group used to signal "toxic waste," she says.

Another person familiar with the files confirmed that the Providian accounts were commonly referred to with that term. The debt had long been considered unreliable and lacked documentation. It was never supposed to be sold, this person says.

A review of state court records shows that second-hand debt buyers are suing people who allegedly owe money on the Chase-Wamu-Providian accounts, however. Informed that the files have surfaced in court, the former Chase employee who confirmed the files' "toxic" status was appalled.

"That's crazy," the person says. "I can't believe they [Chase officials] did that."

Almonte called for the bank to halt the debt sale, but was warned by Lazinbat that "she had better go along with the plan to sell the misrepresented asset," she later wrote in her employment lawsuit.

Almonte says she refused Lazinbat's order and escalated her concerns to his boss, Helaire. Chase fired her on Nov. 30, 2009.

Carole McGinn was not a party to discussions about the debt sale but confirms the thrust of Almonte's claims. "I know she [Almonte] was looking into things that they didn't want her looking into," McGinn says.

The following March, Almonte filed her wrongful termination suit. First reported by the *San Antonio Express-News*, the case brought Chase's alleged problems into public view.

"This is not an accident anymore," Almonte now says. "The same people who created this problem at Chase are still in charge. They aren't going to fix it unless they're forced to."

*NEXT: Almonte sues. The OCC gets interested. Chase fires in-house collections attorneys and the reliability of its judgments comes into question.*

---



© 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT "5"

## AMERICAN BANKER

## How a Whistleblower Halted JPMorgan Chase...

## March 15, 2012

# AMERICAN BANKER.

# How a Whistleblower Halted JPMorgan Chase's Card Collections

**By** Jeff Horwitz
MAR 15, 2012 5:54pm ET

*This is the second in a series on JPMorgan Chase's delinquent credit card collections operation. The first article can be viewed here. Further coverage will follow.*

**No sooner did Linda Almonte show up for work on November 30, 2009 than was she escorted out the door by security at JPMorgan Chase's Credit Card Litigation Support Group in San Antonio. A midlevel Chase executive who oversaw business process execution employees, Almonte says she was fired after just six months on the job for challenging her superiors about the accuracy of the bank's credit card records.**

Colleagues first learned of her dismissal later in the day when operations manager Jason Lazinbat, Almonte's former boss, gathered bank staff in a conference room and announced she was no longer with the bank. Under no circumstances, Lazinbat warned, were staffers to communicate with Almonte, recalls Carole McGinn, a quality control worker who spent 14 years at Chase. The account was confirmed by second employee, who requested to speak anonymously.

"It was an unusual statement," McGinn says. "Other people had left the bank, and we were not told" to cut off contact with them.

The contentious nature of Almonte's departure was a prelude to a series of events that serve as a cautionary tale for the banking industry. The former mid-level staffer eventually filed a whistleblower suit and complaints with regulators that accused Chase of a range of lapses over three years. They include: failure to reconcile the inconsistent past-due balances generated by the bank's computer systems; pressure from management to collect delinquent debts even in the absence of complete or accurate records; and robosigning of affidavits that brings into question the legal integrity of Chase's claims against tens of thousands of consumers.

Many of Almonte's accusations are backed by internal bank documents and current and former employees. What's more, they've forced Chase to cease operations in a collections unit that had previously generated billions of dollars in annual revenues.

Lazinbat did not respond to calls or email messages seeking comment, and the bank previously declined to speak on his behalf. Chase also declined to comment for this story on its own behalf or for the March 12 article.

After publication of that story, however, the bank released a statement saying: "Following issues raised with mortgage documents, we conducted an internal review across the firm and found other procedural issues. We immediately alerted our regulators and worked to address them." With its delinquent credit card customers, Chase added that in the "overwhelming majority of cases" its internal review indicated it had collected the correct amounts.

In contrast, Almonte charged in her wrongful termination suit that Chase fired her for resisting its efforts to sell faulty credit card debts. Chase, in its defense of the suit, made no effort to contest Almonte's allegations about the inaccuracy of its records or to proffer alternative explanations for her firing. Instead, it argued that it could release employees at will under Texas law and was within its rights to sell credit card accounts whose documentation was problematic or missing, as long as it informed buyers.

"[T]he parties explicitly agreed that the judgments were purchased 'as is' and 'with all faults,'" Chase wrote in a brief defending itself against Almonte's wrongful termination suit.

Almonte proved persistent, however. She contacted a number of regulators, including the Securities and Exchange Commission and Federal Trade Commission, expanding on allegations from her wrongful termination suit. She also discussed her complaints with officials from the Office of the Comptroller of the Currency, which oversees nationally chartered banks, including Chase. The OCC dispatched enforcement staffers to the bank's San Antonio facility for two months late last year as part of a still ongoing investigation, as *American Banker* previously reported.

A now defunct website, Legalmorass.com, took up Almonte's cause. The *Wall Street Journal* and the *New York Times* also mentioned her suit in stories on bank documentation problems.

Her attorney, Bruse Loyd of Jones, Gillaspia & Loyd, L.L.P, successfully opposed Chase's attempts to get her case dismissed in court. By then Almonte says she was nearly broke and living with her family in a motel as a result of her inability to find another job in banking. Almonte settled her suit with Chase last April on undisclosed terms and agreed to stop talking about her case.

But Almonte's efforts appear to have prompted the bank to order its in-house collections lawyers to undertake top-to-bottom reviews of "reconciliation," the process by which the bank was supposed to ensure that its legal filings matched the its internal records. That's according to a former Chase attorney who spoke on condition of anonymity.

The bank had never undertaken such reviews before. When pressed by lawyers in the field for an explanation, senior officials at Chase's New York headquarters stated that the OCC was making inquiries about Almonte's allegations, according to the former Chase attorney.

The reviews concluded that Chase's in-house legal work was solid, this person adds. Former members of the bank's litigation support staff agree. However, they add that the serious problems existed elsewhere. Namely, in the bank's back-offices and with outside collections firms, which had limited access to Chase's internal records and financial incentives to recoup as much as possible from consumers.

Instead of focusing solely on those areas, Chase around the middle of last year fired Gail Siegel, who had formerly run its internal collections litigation teams, bank sources say. Then, around the time it

settled with Almonte, Chase ordered its in-house and contract law firms to drop outstanding card-related litigation altogether.

Virtually overnight, Chase mothballed a legal operation that had been producing several billion of dollars in legal judgments a year and more than $1.2 billion in recoveries. Over the next few months, Chase also fired the lead attorneys in most of its satellite offices.

Jerry Salzberg, an Illinois collections attorney was friendly with members of the bank's Chicago litigation office.

"Someone from New York brought in the three lawyers, kicked them out with no warning and dismissed all their cases," he told *American Banker* in January. "These were people who were by the book. … If they weren't the most profitable [of Chase's regional collection teams], they sure as hell were making a lot of money for the bank. … Obviously something happened."

Chase extended its collections revamp to its San Antonio operation last fall, when it announced changes to its longstanding document-signing policies. Previously, management of the credit card litigation support group had instructed employees to use corporate officer titles that existed only for the purposes of signing documents. Often, stacks of affidavits had been signed without a notary being present, as required by law, current and former employees say.

Under the revamp, Lazinbat announced last October that effective immediately Chase was setting up "signing rooms" where employees would review and sign collections files in the presence of notaries.

The reason for the urgency became apparent the following Monday, when OCC investigators arrived, says an employee who worked at the facility at the time. The OCC staff departed last December, after a two-month review of the San Antonio unit, with a large quantity of Chase records in tow.

The scope of the agency's review remains unclear, current and former bank employees say. The OCC declined comment on Chase. In practice, its enforcement reviews generally take months to complete, it said.

Four months after the OCC's departure, Chase insiders say talk has circulated that the bank might resume filing suits against card customers with large delinquent balances.

Meanwhile, in-house card collections attorneys who remain are twiddling their thumbs.

"They [Chase managers] have a lot of people on their payroll," says the former Chase in-house attorney. "I know people sitting in the offices, and they literally don't do anything. People are extremely stressed."

"It's really too bad," says a former Chase attorney who was terminated. "They wanted to file more and more, and they grew too fast. Maybe they just got greedy."

JPMorgan Chase's annual report, filed with the SEC last month, made no reference to its 11-month litigation hiatus or any impact on earnings.

*Next: JPMorgan Chase's deals with debt buyers raise doubts about industry standards and the*

Case 2:12-cv-00701-CBM-OP   Document 24-1   Filed 11/28/12   Page 26 of 26   Page ID #:235

*validity of related consumer lawsuits.*



© 2012 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.